UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGE SERABIAN, | Case No. 1:24-cv-00712-EPG |
| Plaintiff, | FINAL JUDGMENT AND ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| v. | |
| COMMISSIONER OF SOCIAL SECURITY, | (ECF Nos. 12, 16). |
| Defendant. | |

This matter is before the Court on Plaintiff Serge Serabian's ("Plaintiff") complaint for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration regarding his application for disability insurance benefits. The parties have consented to entry of final judgment by the United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c), with any appeal to the Court of Appeals for the Ninth Circuit. (ECF No. 8).

Plaintiff raises the following issues:

A. The physical residual functional capacity ("RFC") determination is not supported by substantial evidence because the Administrative Law Judge ("ALJ") erroneously found consultative examiner Dr. Roger Wagner, M.D.'s opinion persuasive.

B. The ALJ erroneously determined that Plaintiff's mental impairments were non-severe impairments at step two.

C. The ALJ failed to include work-related limitations in the RFC consistent with the

1

nature and intensity of Plaintiff's limitations, and failed to offer legitimate reasons for rejecting Plaintiff's subjective complaints.

Having reviewed the record, administrative transcript,[1] parties' briefs, and the applicable law, the Court finds as follows.

## I. ANALYSIS

### A. Dr. Wagner's Opinion

Plaintiff argues that the ALJ's physical RFC determination is not supported by substantial evidence because the ALJ erroneously assessed the opinion of consultative examiner Dr. Roger Wagner, M.D., as persuasive.[2] (ECF No. 12 at 14–16). In response, the Commissioner argues that the ALJ properly evaluated Dr. Wagner's opinion. (ECF No. 16 at 5–7).

Because Plaintiff applied for benefits in 2021, certain regulations concerning how ALJs must evaluate medical opinions for claims filed on or after March 27, 2017, govern this case. See 20 C.F.R. §§ 404.1520c, 416.920c. These regulations set "supportability" and "consistency" as "the most important factors" when determining an opinion's persuasiveness. See 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). And although the regulations eliminate the "physician hierarchy," deference to specific medical opinions, and assignment of specific "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." See 20 C.F.R. §§ 404.1520c(a)-(b); 416.920c(a)-(b).

As for the case authority preceding the new regulations that required an ALJ to provide clear and convincing or specific and legitimate reasons for rejecting certain medical opinions, the Ninth Circuit has concluded that it does not apply to claims governed by the new regulations:

> The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant. See 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from your medical

---

[1] ECF No. 9-1 comprises the sealed Administrative Record ("AR"). When citing to the record, the Court cites to the AR's internal pagination in the lower right-hand corner of each page, rather than to the CM/ECF document number and page.

[2] The Court notes that a heading in Plaintiff's brief for this argument refers to "Dr. Swanson" instead of Dr. Wagner. (See ECF No. 12 at 13). This reference to Dr. Swanson appears to be a scrivener's error as Plaintiff's argument and other headings in his brief make clear that Plaintiff is challenging the ALJ's evaluation of Dr. Wagner's opinion.

2

> sources."). Our requirement that ALJs provide "specific and legitimate reasons" for rejecting a treating or examining doctor's opinion, which stems from the special weight given to such opinions, see Murray, 722 F.2d at 501–02, is likewise incompatible with the revised regulations. Insisting that ALJs provide a more robust explanation when discrediting evidence from certain sources necessarily favors the evidence from those sources—contrary to the revised regulations.

Woods v. Kijakazi, 32 F.4th 785, 792 (9th Cir. 2022).

Accordingly, under the new regulations, "[t]he agency must 'articulate . . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source, 20 C.F.R. § 404.1520c(b), and 'explain how [it] considered the supportability and consistency factors' in reaching these findings, id. § 404.1520c(b)(2)." Woods, 32 F.4th at 792.

> Supportability means the extent to which a medical source supports the medical opinion by explaining the "relevant . . . objective medical evidence." Id. § 404.1520c(c)(1). Consistency means the extent to which a medical opinion is "consistent . . . with the evidence from other medical sources and nonmedical sources in the claim." Id. § 404.1520c(c)(2).

Id. at 791–92. Ultimately, "an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence." Id. at 787. Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401 (internal citation omitted).

Dr. Wagner completed an internal medicine consultative examination of Plaintiff on November 2, 2021. (AR 605–10). During his examination, Dr. Wagner reviewed Plaintiff's past medical records, his medications, and his activities of daily living. (Id.) After conducting a comprehensive physical examination, Dr. Wagner ultimately opined that Plaintiff could stand and walk for up to six hours with normal breaks, sit without limitation with normal breaks, and lift and carry 20 pounds occasionally and 10 pounds frequently "given [his] slight right-sided weakness." (AR 610). Dr. Wagner also opined that Plaintiff had no manipulative limitations, that he could climb occasionally with no other postural limitations, and that he "should not work around heights or heavy machinery given his reported occasional balance problems." (Id.)

In his written decision, the ALJ first summarized Dr. Wagner's consultative examination and opinion, as follows:

3

Roger Wagner, MD consultatively examined the claimant in November 2021 (Exhibit 8F, pp. 1-7). The claimant complained of stroke, hypertension, neck pain, and low back pain. Dr. Wagner reviewed records indicating an ejection fraction of 57 percent, normal Holter monitor from February 2021, echocardiogram indicated an ejection fraction of 55 to 60 percent, carotid ultrasound indicating atherosclerosis, an operative report for right ureter stent placement in May 2019, a January 2018 CT of the abdomen indicating bilateral renal stones, and MRI of the lumbar and cervical spines. The claimant reported a stroke on December 9, 2020, with some right sided weakness and numbness that was already resolving by the time he got to the emergency room. He was not hospitalized at that time due to the hospital being overloaded with Covid patients. He reported continued right sided weakness, and he complained of slight memory problems and cognitive slowing with difficulty keeping numbers in mind when doing business deals. He also reported very minimal balance problems and he only very rarely used a cane. He reported that he cooked, drove, shopped, walked for exercise, and was independent with his activities of daily living. His medications included Olmesartan, Aspirin, Allopurinol, gabapentin, spironolactone, escitalopram, ropinirole, vitamin D3, potassium citrate, lactose intolerance medication, and Imodium. The claimant smoked one-half a pack per week, down from one pack per week in the past. He occasionally drank alcohol and never used drugs.

The claimant was easily able to get out of the chair and walk at a normal speed to the exam room without assistance, sat comfortably, and was easily able to get on and off the exam table, and bend at the waist to take off his shoes and socks, demonstrating good dexterity and flexibility. He was pleasant and cooperative and provided an adequate history. His dexterity was good, and he was able to oppose fingertips to thumb tips though he had slight difficulty with the right fourth finger opposing the thumb. He was five feet four inches and weighed 156 pounds, his blood pressure was high at 162/96, and his visual acuity without lenses was 20/30 on the left and 20/25 on the right. His chest was symmetric with normal excursions and his lungs were clear to auscultation. Cardiovascular sounds had a regular rate and rhythm with normal S1 and S2 and no extra sounds or murmurs. Peripheral pulses in the carotid, radial, dorsalis, pedis, and posterior tibial were 2+ and equal bilaterally. Extremities were without cyanosis, clubbing, or edema. The claimant was able to walk a couple steps on his toes and heels, he had normal station, gait, and finger to nose, and negative Romberg. He did not use an assistive device for ambulation. Range of motion of the neck, back and other joints was within normal limits, straight leg raises were negative, and motor strength was 5/5 in the left upper and lower extremities and 4+/5 in the right upper and lower extremity. Sensation was intact to light touch and pinprick, and reflexes were 2+, and minimally more brisk in the right than the left upper extremity. Cranial nerves were grossly intact. Dr. Wagner opined that the claimant could stand and walk up to six hours with normal breaks, sit without limitation with normal breaks, and lift and carry 20 pounds occasionally and 10 pounds frequently, given the slight right-sided weakness. The claimant was judged able to occasionally climb and should not work around heights or heavy machinery given reported occasional balance problems and slight right sided weakness.

(AR 35).

The ALJ found Dr. Wagner's opinion persuasive because "his findings [were] consistent with and supported by the overall record." (AR 36). The ALJ also found the opinion persuasive "as Dr. Wagner has considered [Plaintiff's] issues on his right side and has accounted for these issues in his proposed residual functional capacity, which is supported by the treatment record and his own examination findings." (Id.)

The ALJ then proceeded to formulate a physical RFC that limited Plaintiff to light work with additional restrictions, as follows:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can occasionally climb ramps and stairs, but he should not climb ladders, ropes, or scaffolds and should have no workplace hazards such as unprotected heights and moving machinery. In addition, he can perform frequent handling and fingering with the right upper extremity.

(AR 30). The ALJ explained that the above RFC was "consistent with and supported by the overall evidence, which indicates intact motor strength, normal EMG findings, mostly normal examination findings, as well as Dr. Wagner's examination report indicating minimal objective findings beyond slight limitation in motor strength on the right side." (AR 36 (internal record citations omitted)).

Plaintiff raises two challenges to the ALJ's consideration of Dr. Wagner's opinion. (ECF No. 12 at 13–16). Plaintiff first argues that Dr. Wagner's opinion is "not consistent with the objective findings on MRI." (Id. at 14). Plaintiff specifically contends that the MRI results do not support Dr. Wagner's opinion in his report that Plaintiff's back and neck pain were "most consistent with occasional muscle strain." (Id.) Plaintiff, however, overlooks that Dr. Wagner actually reviewed Plaintiff's past MRIs during the consultative examination. (AR 605). Dr. Wagner specifically noted: (1) an MRI of the lumbar spine, dated January 8, 2021, which Dr. Wagner stated showed degenerative joint disease, and (2) an MRI of the cervical spine, dated December 14, 2020, which Dr. Wagner stated showed "degenerative joint disease with a cord deformity and foraminal narrowing." (Id.) And although Dr. Wagner opined that Plaintiff's neck and lower back pain were consistent with "occasional musculoligamentous strain," he expressly acknowledged that the MRI "does show some cord deformity and foraminal narrowing." (AR 609–10).

Moreover, the ALJ considered the MRI results when he formulated Plaintiff's physical RFC. The ALJ summarized the MRI findings (AR 32–33) and explicitly stated that the physical RFC was based on the "MRI of the cervical spine" in addition to Plaintiff's "subjective complaints of right upper extremity issues" and the "slightly limited strength on the right side indicated by Dr. Wagner." (AR 36). Thus, the ALJ discussed the significance of the MRI results in the context of Dr. Wagner's opinion. While Plaintiff argues that his MRI results could support a different conclusion as to degree of his physical impairments and the persuasiveness of Dr. Wagner's opinion, this at most amounts to another "rational interpretation," meaning that "the decision of the ALJ must be upheld." Orteza v. Shalala, 50 F.3d 748, 749 (9th Cir. 1995); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); Ahearn v. Saul, 988 F.3d 1111, 1115 (9th Cir. 2021) (stating that the Court "may not reweigh the evidence or substitute [its] judgment for that of the ALJ").

Second, Plaintiff appears to argue that the ALJ failed to consider Dr. Wagner's assessment of his "lower extremity weakness and balance problems" and his need for a cane when he formulated the physical RFC. (ECF No. 12 at 15). But, as the Commissioner points out, the ALJ imposed certain limitations in the RFC based on Dr. Wagner's opinion that Plaintiff had occasional balance problems and slight right-handed weakness. (AR 36). As for Plaintiff's contention that the RFC failed to address his need for an assistive device, the ALJ explicitly noted that Plaintiff told Dr. Wagner that he rarely used a cane. (AR 30, AR 609). The ALJ also observed that Plaintiff's treatment records did not mention that an assistive device was medically necessary, that Plaintiff presented with a normal gait during both of his consultative examinations, and that Plaintiff's treating providers consistently reported that he had a normal gait upon examination. (Id. (citing AR 534, AR 626, AR 600, AR 608)).

Accordingly, the Court concludes that Plaintiff has not shown error in the ALJ's consideration of Dr. Wagner's opinion.

**B. Step Two**

Plaintiff next argues that the ALJ erroneously determined at step two that he did not have any severe mental impairments. (ECF No. 12 at 16–18). In response, the Commissioner argues

1  that the ALJ's step two findings are supported by substantial evidence and free from legal error.

2  (ECF No. 16 at 7–10).

      The Ninth Circuit has provided the following guidance regarding whether medically determinable impairments are severe at step two:

> An impairment or combination of impairments may be found "not severe <u>only</u> if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." [<u>Smolen v. Chater</u>, 80 F.3d 1273, 1290 (9th Cir. 1996)] (internal quotation marks omitted) (emphasis added); see <u>Yuckert v. Bowen</u>, 841 F.2d 303, 306 (9th Cir. 1988). The Commissioner has stated that "[i]f an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." S.S.R. No. 85–28 (1985).

<u>Webb v. Barnhart</u>, 433 F.3d 683, 686-87 (9th Cir. 2005). A step two finding must be supported by substantial evidence, which "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Id.</u> at 686.

      Here, as to mental impairments, the ALJ initially noted in his step two findings that Plaintiff's treatment records showed "a history of depression with some recent complaints of depression that were treated with Lexapro by his general provider." (AR 28 (internal record citations omitted)). The ALJ also noted that the medical evidence did not include any counseling or psychiatric treatment, despite Plaintiff's allegations that he had seen a psychiatrist and undergone counseling for depression. (<u>Id.</u>) The ALJ further observed that Plaintiff's general provider had diagnosed him with "major depressive disorder, single episode, unspecified." (<u>Id.</u>) Based on the general provider's diagnosis and Plaintiff's prescription for Lexapro, the ALJ found that Plaintiff had a medically determinable impairment of depression. (<u>Id.</u> (citing AR 652)).

      The ALJ, however, concluded that Plaintiff's medically determinable impairment of depression was non-severe because "it does not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities." (AR 29). In reaching this determination, the ALJ addressed in detail the four functional areas set out in the "Paragraph B" criteria for evaluating mental impairments. (<u>Id.</u>). The ALJ's analysis of the four functional areas specifically considered Plaintiff's subjective statements about his mental limitations with the relevant objective medical evidence and Plaintiff's September 2021 psychiatric consultative examination (AR 598–603), as follows:

> The first functional area is understanding, remembering or applying information. In this area, the claimant has no more than a mild limitation. While the claimant alleges significant memory problems (Exhibit 3E; testimony), his memory was within normal limits at the consultative examination and was consistent with his IQ tests (Exhibit 7F). The claimant also reported that he is able to manage his own finances and drives (Exhibit 3E), and he typically presented to providers with normal mental status findings (Exhibits 2F, p. 56; 11F, p. 6; 12F, pp. 5, 10; 13F, p. 3).
>
> The next functional area is interacting with others. In this area, the claimant has no more than a mild limitation. The claimant testified that he lives with his son half the time and his mother would regularly come over with food and to help him. He reportedly spends time with others on the phone and texting, gets along with authority figures, and has no problems getting along with family, friends, neighbors, or others (Exhibit 3E). He also testified that he attends his son's sporting events.
>
> The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has no more than a mild limitation. While the claimant reported that he was only able to pay attention for a few minutes (Exhibit 3E, p. 6), he was able to answer questions and pay attention at the hearing that lasted over 45 minutes. He reported watching television and movies, driving, and an ability to manage his own finances (Exhibit 3E). His concentration was adequate for performing simple mathematical calculations at the consultative examination (Exhibit 7F).
>
> The fourth functional area is adapting or managing oneself. In this area, the claimant has no more than a mild limitation. While the claimant alleges limited daily activities with the need for assistance with meal preparation and personal care, his young son lives with him half the time and requires some degree of care and transportation to school. Also, he told the psychological consultative examiner that he was independent with his activities of daily living (Exhibit 7F) and he told the physical consultative examiner that he cooked, drove, shopped, walked for exercise, and was independent with his activities of daily living (Exhibit 8F).

(AR 29). The ALJ concluded Plaintiff's depression was non-severe because it caused "no more than 'mild' limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in [Plaintiff's] ability to do basic work activities." (AR 29–30).

In concluding that Plaintiff's depression was a non-severe impairment, the ALJ also relied on Plaintiff's psychiatric consultative examination in September 2021. (AR 28). In particular, the ALJ pointed out that the consultative examiner "did not provide any diagnoses for mental impairments" and rendered an opinion that did not place any limits on work-related mental

functioning. (Id.) The ALJ found the consultative examiner's report and opinion to be "generally persuasive" because Plaintiff's "presentation [at the consultative examination] was similar to reports of his mental status in the treatment record." (Id.) The ALJ concluded that his finding that Plaintiff's depression was non-severe was "consistent with the opinion of [consultative examiner] Dr. Swanson, who found no limits on work-related mental functioning" and was "supported by the overall record, as well as Dr. Swanson's examination report." (AR 28–29). Based on the above findings, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff's depression is a non-severe impairment.

Plaintiff additionally argues that the ALJ failed to consider a state agency medical consultant's finding at the initial level of review that he has a severe neurocognitive disorder. (ECF No. 12 at 16). The Court observes that while the disability form Plaintiff references listed neurocognitive disorders as a severe impairment, it also included a psychiatric review technique ("PRT") which concluded that "[n]o mental medically determinable impairments [are] established." (AR 76–77). The form also included an additional explanation that:

> There is evidence in file noting the claimant is taking Lexapro but little explanation as to why. There does not appear to be a formal diagnosis of anxiety or depression and the claimant's mental status examination are benign. At the current consultative examination the claimant's mood is euthymic and affect is full range. There is no indication on testing of any cognitive impairment and the provider gave No Diagnosis. No mental MDI [(medically determinable impairment)].

(AR 77). Additionally, the Court observes that at the reconsideration level, the same disability form did not list any severe mental impairments and the PRT again stated that "[n]o mental medically determinable impairments [are] established." (AR 94–95). Significantly, aside from the single mention in the disability form at the initial level, Plaintiff does not allege that any of his providers diagnosed him with a neurocognitive disorder.

Plaintiff also argues that the ALJ failed to consider nonmedical evidence consisting of his subjective complaints and hearing testimony regarding mental limitations. (ECF No. 12 at 18). But, as discussed earlier, the ALJ considered Plaintiff's subjective complaints and hearing testimony in assessing the paragraph B criteria for evaluating mental impairments. (AR 29).

Based on the foregoing, the Court concludes that Plaintiff has not shown error in the ALJ's step two findings regarding Plaintiff's mental impairments.

Moreover, even if Plaintiff had shown that the ALJ erred by not finding that Plaintiff had severe mental impairments of depression or neurocognitive disorder, the error would be harmless. Any error in failing to find an impairment severe at step two is harmless where the ALJ considers the impairment in subsequent steps of the analysis. See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007). Here, the ALJ considered Plaintiff's depression in his subsequent analysis. (See, e.g., AR 33–34). And as for neurocognitive disorder, the Court notes that in formulating Plaintiff's RFC, the ALJ specifically addressed the state agency medical consultant's opinions and explained why he found their opinions unpersuasive. (AR 36). In so doing, the ALJ noted in particular that "[t]he State agency medical consultants did not have the full record to review, as additional records from Exhibit 9F through Exhibit 13F were added after the reconsideration review." (Id.) Further, in formulating Plaintiff's RFC, the ALJ determined that Plaintiff did not have any functional work limitations due to mental impairments. The ALJ specifically noted that Plaintiff's neurological examinations were generally normal and that he was stable with medication. (AR 33 ("Neurological exam at this time indicated normal behavior, thoughts, and higher mental functions, normal language, cranial nerve, motor strength, sensation, gait, and finger to nose testing, and reflexes were 1+ bilateral and symmetric") (citing AR 534); AR 33 ("[L]anguage, cranial nerves, motor exam, and cerebellar exams were observed as normal") (citing AR 388); AR 34 ("claimant reported experiencing brain fog . . . [but] [e]xam was normal . . ."); AR 34 ("Exam was normal with normal behavior, content of thought, higher mental functioning, gait, and sensation, motor strength was 5/5, and there was decreased right sided neck movement and right biceps reflexes. He was continued on Lexapro and gabapentin again and he was referred for cervical epidural injection and told to relax, as his depression increased his pain.") (citing AR 626)); AR 31 (noting Plaintiff's hearing testimony that Lexapro was "helpful" in treating his depression).

### C. Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ failed to provide specific, clear and convincing reasons to reject his subjective complaints and thus failed to account for all of his limitations in formulating the RFC. (ECF No. 12 at 19–24). The Commissioner counters that the ALJ's reasoning was sufficient to discount Plaintiff's subjective complaints. (ECF No. 16 at 10–13).

As to a plaintiff's subjective complaints, the Ninth Circuit has provided the following guidance:

> Once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence. Bunnell v. Sullivan, 947 F.2d 341, 343 (9th Cir. 1991) (en banc); see also Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986) ("it is improper as a matter of law to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings"). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing." Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989). General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints.

Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995), as amended (Apr. 9, 1996). However, "[t]he standard isn't whether [the] court is convinced, but instead whether the ALJ's rationale is clear enough that it has the power to convince." Smartt v. Kijakazi, 53 F.4th 489, 499 (9th Cir. 2022). An ALJ's reasoning as to subjective testimony "must be supported by substantial evidence in the record as a whole." Johnson v. Shalala, 60 F.3d 1428, 1433 (9th Cir. 1995); see Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008) ("Accordingly, our next task is to determine whether the ALJ's adverse credibility finding of Carmickle's testimony is supported by substantial evidence under the clear-and-convincing standard.").

Here, as to Plaintiff's subjective complaints, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause [his] alleged symptoms." (AR 32). Accordingly, because there is no affirmative evidence showing that Plaintiff was malingering, the Court looks to the ALJ's decision for clear and convincing reasons, supported by substantial evidence, for not giving full weight to Plaintiff's symptom testimony.

The ALJ provided the following recitation of Plaintiff's subjective complaints and his daily activities:

> The claimant testified that he cannot work because his right side is either weak or numb from his feet to his arms. He is not as smart as he used to be, and any math problems take longer to do when he used to do them in his head in seconds. He can no longer do math in his head. He has to move around after sitting for a few minutes. He has trouble writing for more than three minutes because his hand feels like it locks up. He is not getting any treatment due to the lack of insurance, and his general provider does not accept MediCal or take cash. He was seeing a cardiologist, neurologist, nephrologist, and urologist before he lost his insurance.

> He is taking medications for his brain and blood pressure, and the others he does not know. He could not remember when he began taking Lexapro for depression and he ran out of the medication a few days prior and did not have any refills. The medication was helpful. He does not use a cane at home, but he keeps one in his car for when he needs it. On a typical day, he said when he has his son, his son will wake him up and he takes his son to school, which is 400 to 500 meters away. He may have coffee, read news online, and rest the remainder of the day. His son walks home from school if weather permits, otherwise, he will pick him up. They do not do a lot of activities. He can't play sports with his son for more than a few minutes. His son is on a baseball team, and he will watch the practices.
>
> He testified he can read on his phone for five or six minutes before he takes a break for 30 minutes and lays down. He lays down most of the day. He feels like he cannot do anything. His mom brings him food and does most of his grocery shopping. He must take a 20-to-30-minute break after using his right hand for a few minutes. He does not have difficulty using his left hand. He can reach overhead with the right hand to get an item such as a water glass or coffee mug, or milk or juice from the refrigerator. He can comfortably lift a half gallon of milk with his right hand. He will drop anything that weighs more than that. He can stand for 15 to 20 minutes before he becomes uncomfortable. He tries to walk around the block on days he feels semi-normal. The longest he can hold his head in one position on the phone is for three to five minutes before he feels discomfort. If he doesn't stop, the discomfort will get worse. He drives when he is feeling okay. If he feels weakness on his right side, he does not drive. He drives two or three times a week locally. He can dress himself with some difficulty on some days. He enjoyed working and has worked since he was 15 years old, and he is sad to have the brain fog he experiences. Sometimes he cannot find the words to express himself. He does not socialize often, and he used to be a social person, who had friends over and would go out to dinner.

(AR 31–32).

Following this recitation, the ALJ stated that Plaintiff's testimony regarding the limiting effects and severity of his impairments was "not entirely consistent with the medical evidence and other evidence in the record." (AR 32). In particular, the ALJ pointed out that while Plaintiff indicated in his function report and hearing testimony that he had "very limited daily activities and [needed] assistance with personal care," Plaintiff told Dr. Wagner during the consultative examination that he "cooked, shopped, and was independent with his daily activities." (Id. (citing AR 606 (consultative examination where Plaintiff reported that "He cooks and cleans. He drives, shops and performs his own activities of daily living without assistance and walks some for exercise")).

In addition to the above inconsistency in daily activities, the ALJ noted that Plaintiff's

allegations of "significant weakness in his body and an ability to perform activities for only very short periods" were inconsistent with the medical evidence, with the ALJ specifically highlighting that Plaintiff had "generally normal" examinations as well as normal nerve conduction studies. (AR 32). The ALJ then provided an overview of Plaintiff's medical treatment records. (AR 32–34). In so doing, the ALJ noted among other things that: (1) Plaintiff had normal neurological and/or physical examinations during multiple treatment visits (AR 32–34 (citing e.g., AR 388, AR 432, AR 534, AR 577, AR 626, AR 628, AR 637, AR 664, AR 671)); (2) a brain MRI, dated December 9, 2020, showed "no evidence of acute intracranial abnormality" (AR 382); (3) a February 2021 MRI of the head "showed minimal nonspecific white matter changes and the remainder of the study was normal" (AR 545); (4) an "essentially unremarkable" MRI angiogram of the brain (AR 543); (5) normal nerve conduction studies in February 2021 (AR 535–37); (6) an initial cardiac workup in January 2021 where Plaintiff was diagnosed with atrial fibrillation and "aggressive blood pressure control was recommended" (AR 499), but a six-month follow-up cardiac visit "indicated normal exam and a diagnosis of hypertensive heart disease without congestive heart failure" with the provider reporting that no "further intervention was indicated or necessary" (AR 637–38); and (7) normal exams and no reported kidney pain during nephrology visits in 2022, despite an ultrasound revealing the presence of a kidney stone (AR 641–46). After discussing the medical evidence, the ALJ concluded that:

> Overall, the claimant had symptoms and findings related to his severe impairments. However, treatment was conservative throughout the record and his conditions were treated with medication only. He did not require significant intervention, did not require emergent care, and was generally stable on medications. He also had no neurological findings and nerve conduction studies were normal. Regardless, the undersigned has provided for the claimant's reported right hand symptoms, in the residual function capacity.

(AR 34).

Upon review of the record, the Court concludes that the ALJ provided "findings sufficiently specific to permit the [C]ourt to conclude that the ALJ did not arbitrarily discredit [Plaintiff's] testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002); see Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) ("Our cases do not require ALJs to perform a line-by-line exegesis of the claimant's testimony, nor do they require ALJs to draft dissertations when denying benefits."). The ALJ provided clear and convincing reasons as to why the medical

evidence did not support Plaintiff's allegations concerning the severity and limiting effects of his impairments. Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (noting that conflicts between testimony and objective medical evidence supported discounting a plaintiff's credibility); Wellington v. Berryhill, 878 F.3d 867, 876 (9th Cir. 2017) ("[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability."); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."). Further, the ALJ made a reasonable determination that Plaintiff's statements during his consultative examinations contradicted his hearing testimony regarding his daily activities. See Smartt, 53 F.4th at 499 ("An ALJ may also consider whether the claimant engages in daily activities inconsistent with the alleged symptoms. Even if the claimant experiences some difficulty or pain, her daily activities may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.").

Plaintiff argues the ALJ failed to consider his complaints of medication side effects and that he needed an assistive device. (ECF No. 12 at 21). However, as the Commissioner points out, the ALJ acknowledged Plaintiff's complaints of side effects in his treatment records and noted that Plaintiff's medical providers adjusted Plaintiff's medication regime to resolve the side effects he was experiencing. (See, e.g., AR 33 (after Plaintiff reported feeling somnolence during a March 2021 visit, treating provider changed Plaintiff's prescribed medications, specifically discontinuing two medications); id. (noting that "[p]roviders switched the claimant from metoprolol to [i]nderal to help the palpitations and tremors")). And as for Plaintiff's alleged need for an assistive device, the ALJ noted that Plaintiff testified during the hearing that he did not use a cane at home and only kept one in his car for when he needed it, and that Plaintiff previously reported during a consultative examination that he rarely used a cane. (AR 30 (citing AR 54, AR 609)). Notably, the ALJ also observed that there was nothing in Plaintiff's treatment records reflecting that any provider had determined an assistive device was medically necessary, that Plaintiff presented with a normal gait during both of his consultative examinations, and that Plaintiff's treating providers had also noted he had a normal gait upon examination. (Id. (citing

AR 534, AR 626, AR 600, AR 608)). As such, the ALJ provided specific, clear and convincing reasons for discounting Plaintiff's alleged medication side effects and his alleged need for an assistive device.

In sum, the Court concludes that the ALJ provided clear and convincing reasons, supported by substantial evidence, for not giving full weight to Plaintiff's subjective complaints.

## II.    CONCLUSION AND ORDER

Based on the foregoing, the decision of the Commissioner of Social Security is affirmed. The Clerk of Court is directed to enter judgment in favor of the Commissioner of Social Security and to close this case.

IT IS SO ORDERED.

Dated:   **March 11, 2025**                                /s/ Erica P. Grosjean
                                                                                 UNITED STATES MAGISTRATE JUDGE